CLERK'S OFFICE
A TRUE COPY
Jul 29, 2024
s/ E Borden

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   24   MJ   161 |
| Information associated with Facebook account, www.facebook.com/agnes.scott.75, User ID 616862861 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b, | Anti-Kickback Statute, |
| 18 U.S.C. § 1347, | Healthcare Fraud, |
| 18 U.S.C. § 1035 | False Statements Related to Healthcare |

The application is based on these facts:
See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jill Dring, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 07/29/2024

_____
*Judge's signature*

City and state: Milwaukee, WI

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jill Dring, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Meta Platforms Inc., a social technology company headquartered at 1601 Willow Road, Menlo, California 94025.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platforms Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since March of 2013.  As a Special Agent, I investigate civil and criminal matters related to health care fraud involving violations of the Health Care Fraud Statute, False Claims Act, Anti-Kick Back Statute and Stark Law.  Prior to investigating health care fraud matters, I investigated criminal and national security related computer intrusion matters involving botnets, distributed denial of service attacks, the distribution of SPAM, malicious software, the theft of identification information, and other computer-based fraud. I have received training in computer technology and computer-based fraud and health care fraud.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 42 U.S.C. § 1320a-7b (the Anti-Kickback Statute), 18 U.S.C. § 1347 (Healthcare Fraud), and 18 U.S.C. § 1035 (False Statements Related to Healthcare) have been committed by Demaryl Howard and other individuals connected to Fortunate Futures, a Prenatal Care Coordination company. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

## PROBABLE CAUSE

*I.    Medicaid Background*

6.    By way of background, a Prenatal Care Coordination (PNCC) agency provides services that are reimbursed under Wisconsin Medicaid. The purpose of the PNCC program is to provide access to medical, social, educational, and other services to pregnant women who are considered at high risk for adverse pregnancy outcomes. The components of this benefit are outreach, assessment, care plan development, ongoing care coordination and monitoring, and health education and nutrition counseling.

7.    PNCC services are reimbursed under Wisconsin Medicaid when provided in accordance with Wisconsin Medicaid's rules and regulations. Covered services related to PNCC services are listed in Wis. Admin. Code § DHS 107.34.

8.     When enrolling in Wisconsin Medicaid, the owners of PNCCs sign a provider agreement. In the provider agreement, it states that every time a provider submits a claim they are certifying that they have not offered, paid or received any type of illegal remuneration in violation of 42 U.S.C. § 1320a-7b, Wis. Stat. § 946.91(3).

9.     Wisconsin Department of Health Services (DHS) maintains an online portal that allows for the submission of allegations of fraud involving Wisconsin Medicaid-funded providers. This online portal assists DHS in its mission to identify and investigate Wisconsin Medicaid fraud. DHS performs its own investigation. When deemed necessary, DHS forwards these investigations as credible allegations of fraud to the Medicaid Fraud Control and Elder Abuse Unit (MFCEAU) to prosecute civil and criminal offenses related to the Wisconsin Medicaid program.

10.     Per Wis. Admin. Code § DHS 107.34, PNCC agencies are required to work with a Qualified Professional. Prior to services being performed for a Medicaid recipient by a PNCC, and the subsequent reimbursement by Wisconsin Medicaid, the PNCC must complete an initial assessment and care plan with the client. The Qualified Professional either completes that assessment him or herself, or reviews and signs the assessment.

11.     Per Wis. Admin. Code § DHS 105.52 (5), PNCC agencies are required to maintain a written record of all recipient-specific prenatal care coordination monitoring which include but is not limited to: the dates of service, description of service provided, the staff person doing the monitoring, the contacts made and the results. These notes are commonly referred to as progress notes.

*II.*     *Fortunate Futures and Agnes Scott*

12.     Demaryl Howard is the owner of Fortunate Futures, a PNCC located at 3020 W. Vliet Street in Milwaukee, Wisconsin. Fortunate Futures first enrolled as a PNCC agency on or about December 26, 2015.

13.     In or around May 2022, the Wisconsin Department of Health and Human Services conducted an onsite record collection audit of Fortunate Futures. The audit revealed a lack of care plans for members enrolled in the program. The audit also revealed missing employment records; Fortunate Futures was able to provide resumes for six of their twenty-one employees. Additionally, the audit involved a review of progress notes, which review revealed progress notes that were written to support billing for deceased members/clients, progress notes that were cloned for multiple clients/members, and progress notes that were identical for the same client/member for multiple months.

14.     Fortunate Futures provided enrollment and care plans for 4 of the 36 members selected for a record request. These members had care plans dated in 2018 and 2019 that all lacked the signature of a qualified professional.

15.     Fortunate Futures was unable to provide care plan records (or enrollment records) for the remaining 32 members.

16.     DHS Office of Inspector General (OIG) Research Specialist Melanie Carroll questioned Fortunate Future's owner, Demaryl Howard, on care plan policies. Mr. Howard confirmed he was the only Qualified Professional on staff and was responsible for care plans. Mr. Howard outlined his procedures for care plans, which he stated were completed every six months. Mr. Howard said he would review and sign care plans completed by the Care Coordinator. When questioned about the 2018-2019 dates on the care plans given for four members, Mr. Howard

explained that he had fallen behind on reviewing the care plans. Mr. Howard stated that the care coordinators may have the care plans but was unsure. Fortunate Futures informed OIG staff of the names of 21 current care coordinators working as contractors for Fortunate Futures. When asked for employment records for the care coordinators, Mr. Howard provided six resumes. Mr. Howard was unable to locate any other employment records and was unsure where those files are located.

17.     Fortunate Futures provided progress notes for all 36 members. Progress notes were filled out by the care coordinators. OIG completed an initial review, which identified the following concerns:

        a.  Notes written for a member who was deceased. The member passed away on
            August 18, 2021, but there are seven progress notes for 14 hours of services
            purportedly provided from August 21, 2021, to September 18, 2021.

        b.  Cloned documentation between multiple members, *i.e.* different members with
            identical progress notes.

        c.  Cloned documentation for the same member for multiple months.

        d.  Notes that appeared copied, with members' name and dates added.

        e.  Inflated hours for services provided.

18.     In addition, many services listed on the progress notes appear to be out of the scope of the program and would be non-covered services.

19.     Agnes Scott worked as a care coordinator for Fortunate Futures. Based on an analysis of bank records associated with Fortunate Futures, Ms. Scott received payments from 2/1/2019 through 5/27/2022 to work as a care coordinator for Fortunate Futures. In that role she was supposed to service clients/members and to provide them PNCC and CCC benefits. A review

of progress notes revealed a total of 19 clients who were purportedly serviced by Ms. Scott. A review of Fortunate Futures' billing revealed $80,832.00 billed to Medicaid for those clients.

20.     Investigators interviewed numerous women who were clients of Fortunate Futures to determine if they enrolled for services, if they received any gifts or prizes, and if they received any approved services from Fortunate Futures.

21.     During an interview of R.B., whose children were 8, 12, 14 and 18 at the time of the interview, R.B. stated that she did not think that she had received any items or resources from Ms. Scott. R.B. met Ms. Scott once or twice at the office for Fortunate Futures and spoke with Ms. Scott over the phone once or twice. Infrequent contact was made through Facebook. The Medicaid billing data showed claims for 438 hours' worth of services from March 2018 through April 2022, purportedly provided to R.B.

22.     During an interview of S.M., who has seven children, S.M stated that she met Ms. Scott at various locations but never the office for Fortunate Futures or her home. S.M. recalled receiving diapers and baby clothes from Ms. Scott. S.M. and Ms. Scott were "friends" on Facebook. The Medicaid billing data showed claims for service amounting to 360 hours' worth of services provided from May 2018 through March 2022, purportedly provided to S.M.

23.     During an interview of M.W., who has four children, M.W. recalled receiving diapers and wipes on one or two occasions from Ms. Scott. M.W. stated that Ms. Scott created a Facebook page that had resources for moms and Ms. Scott routinely posted information to the page. Medicaid billing data showed claims for service amounting to 386 hours' worth of services from April 2018 through March 2022, purportedly provided to M.W.

24.     During an interview of T.J., who has two children, T.J. stated that she was part of a group chat with Ms. Scott on Facebook. T.J. said she recalled Ms. Scott providing her with pull-

ups and taking her to a food pantry. The Medicaid billing data for T.J. showed claims dating from March 2018 through March 2022 for a total of 346.25 hours' worth of services. T.J. stated that after 2018, she did not receive any "physical services" from Ms. Scott. The only contact T.J. had with Ms. Scott after 2018 was through the group chat on Facebook.

*III.    The Target Facebook Account*

25.    Ms. Scott attended a meeting with me and two Assistant United States Attorneys at the U.S. Attorney's office on July 9, 2024. Ms. Scott was represented by counsel. During that interview, Ms. Scott stated that she created a group Facebook chat for her Fortunate Future clients. Ms. Scott said that her Facebook page is in her true name, Agnes Scott, and the moms were invited to a group chat within Ms. Scott's Facebook page. Ms. Scott titled the group chat, "Resource Group." Ms. Scott said she posted information to the page to provide information to her clients. For example, Ms. Scott showed agents the following messages that she had posted to her account: in December 2021, Ms. Scott posted information regarding the Housing Authority of the City of Milwaukee; on October 29, 2022, Ms. Scott posted an advertisement for a free kids coat give-away; and in December 2023, Ms. Scott posted to her Facebook "Resource Group" information about Milwaukee Landlords.

26.    Ms. Scott was cooperative in the interview and showed agents screenshots of these messages. However, Ms. Scott was unable/unwilling to screenshot each message given the voluminous nature of the group chat.

27.    During the interview, Ms. Scott also told investigators that she had other conversations with clients/members and potential clients/members via her Facebook account, but was unable to identify them or to export those conversations.

28.    The Facebook account that Ms. Scott identified as her own, from which the above sample messages came, bears the username "Agnes Scott" and the URL www.facebook.com/agnes.scott.75, User ID: 616862861 (the "Target Account").

29.    Based on my training and experience, particularly in other investigations related to the PNCC benefit, information contained in Facebook accounts can provide evidence of healthcare fraud and false statements related to healthcare matters as it can indicate, among other things, how often a care coordinator had contact with a member, how long the contact lasted, and when the contact began. Comparing such information about the care coordinator's contact with the clients/members with billing data can demonstrate whether the billing data is fabricated. Additionally, Facebook conversations can provide insight into whether members/clients were provided with, or offered, kickbacks in exchange for signing up for Medicaid-covered services.

30.    Based on my training and experience, and the information provided by Ms. Scott, it is likely that there is information in Ms. Scott's Facebook account that is relevant to the investigation and cannot be reasonably obtained through means other than a search of the Facebook account.

## TECHNICAL INFORMATION ABOUT FACEBOOK

31.    Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32.    Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and

zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

33.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

37.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

45.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

46.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically

retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

47.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive

and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

48. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **CONCLUSION**

49. Based on the foregoing, I request that the Court issue the proposed search warrant.

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with Facebook account, www.facebook.com/agnes.scott.75, User ID 616862861 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the ID listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts or conversations related to PNCC services from February 1, 2019 to the present.

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from February 1, 2019 to the present, which relate to the PNCC benefit, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All other records and contents of communications and messages made or received by the user from February 1, 2019 to the present, which relate to PNCC services or benefits, including all

Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(e)     The types of service utilized by the user;

(f)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(g)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) involving Demaryl Howard and Agnes Scott since February 1, 2019, including, for the ID identified on Attachment A, information pertaining to the following matters:

(a)     Evidence demonstrating a scheme to defraud Wisconsin Medicaid; evidence demonstrating the provision of kickbacks in exchange for medical services and/or billing; evidence of communications regarding how to conduct billing or avoid detection of billing fraud; communications between or among Scott and Howard, and other owners or coordinators participating in the fraud; communications between the Scott and her clients;

(b)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).


This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

☐ Original          ☐ D

CLERK'S OFFICE
A TRUE COPY
Jul 29, 2024
s/ E. Borden

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   24   MJ   161 |
| | ) | |
| | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:




        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:




        **YOU ARE COMMANDED** to execute this warrant on or before _____08/12/2024_____ *(not to exceed 14 days)*
        ☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
        *(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

        ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      07/29/2024 at 10:45 a.m.        _William E. Duffin_____

        *Judge's signature*

City and state:          _____          _____
        *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with Facebook account, www.facebook.com/agnes.scott.75, User ID 616862861 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts or conversations related to PNCC services from February 1, 2019 to the present.

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from February 1, 2019 to the present, which relate to the PNCC benefit, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All other records and contents of communications and messages made or received by the user from February 1, 2019 to the present, which relate to PNCC services or benefits, including all

Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(e)     The types of service utilized by the user;

(f)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(g)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1347 (Healthcare Fraud), 18 U.S.C. § 1035 (False Statements Related to Healthcare), 42 U.S.C. Section 1320a-7b (Illegal Kickbacks) involving Demaryl Howard and Agnes Scott since February 1, 2019, including, for the ID identified on Attachment A, information pertaining to the following matters:

(a)     Evidence demonstrating a scheme to defraud Wisconsin Medicaid; evidence demonstrating the provision of kickbacks in exchange for medical services and/or billing; evidence of communications regarding how to conduct billing or avoid detection of billing fraud; communications between or among Scott and Howard, and other owners or coordinators participating in the fraud; communications between the Scott and her clients;

(b)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).


This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.